# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
------------------------------------------------------------------X
JOHN ANDERJASKA, CHUNGYAO CHEN,
TEENA COLEBROOK, JOEL GRIFFITH,                                      **SUMMONS**
ART HEINEMAN, CALVIN WILLIAMS,
CHARLES WITTE, on behalf of themselves                              Index No.:
and all others similarly situated,                                 Date Index No. Purchased:

                                        Plaintiffs,

                    -vs-

BANK OF AMERICA, N.A.,
CAPITAL ONE, N.A.,
CITIBANK, N.A.,
J.P. MORGAN CHASE, N.A.,
WELLS FARGO BANK, N.A.,

                                        Defendants.
------------------------------------------------------------------X
           TO THE ABOVE-NAMED DEFENDANTS:

           **PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** and

required to serve upon Plaintiffs' attorney an answer to the complaint in this action within

twenty days after the service of this summons, exclusive of the day of service, or within

thirty days after service is complete if this summons is not personally delivered to you

within the State of New York.

           **YOU ARE FURTHER NOTIFIED** should you fail to answer a judgment will be

entered against you by default for the relief demanded in the complaint.

Dated: Fresh Meadows, New York
           February 9, 2019

                                        _____/Jonathan E. Neuman/_____
                                        JONATHAN E. NEUMAN, ESQ.
                                        *Attorney for Plaintiffs*
                                        176-25 Union Turnpike, Suite 230
                                        Fresh Meadows, New York 11366
                                        (347) 450-6710
                                        (718) 228-3689 *facsimile*
                                        jnesq@jenesqlaw.com

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 3 of 36

**Defendants' Address:**

BANK OF AMERICA, N.A.
100 North Tryon Street, Charlotte, NC 28255

CAPITAL ONE, N.A.
1680 Capital One Drive, McLean, VA 22102

CITIBANK, N.A.
399 Park Avenue, New York, NY 10022

J.P. MORGAN CHASE, N.A.
270 Park Avenue, New York, NY 10017

WELLS FARGO BANK, N.A.
420 Montgomery Street, San Francisco, CA 94104

**VENUE:**      Plaintiffs designate New York County as the place of trial.  The basis of the venue designated is the address of multiple Defendants.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------------------------------------------------------X

JOHN ANDERJASKA, CHUNGYAO CHEN,
TEENA COLEBROOK, JOEL GRIFFITH,
ART HEINEMAN, CALVIN WILLIAMS,
CHARLES WITTE, on behalf of themselves
and all others similarly situated,

                                Plaintiffs,

                  -vs-

BANK OF AMERICA, N.A.,
CAPITAL ONE, N.A.,
CITIBANK, N.A.,
J.P. MORGAN CHASE, N.A.,
WELLS FARGO BANK, N.A.,

                             Defendants.

-------------------------------------------------------------------X

**CLASS ACTION**
**COMPLAINT**

Index No.

**JURY TRIAL DEMANDED**

On behalf of themselves and all plaintiffs similarly situated, Plaintiffs, JOHN

ANDERJASKA, CHUNGYAO CHEN, TEENA COLEBROOK, JOEL GRIFFITH, ART

HEINEMAN, CALVIN WILLIAMS, and CHARLES WITTE, by and through their

attorney, JONATHAN E. NEUMAN, ESQ., respectfully allege as follows:

**PRELIMINARY STATEMENT**

1.  This is a class action complaint brought on behalf of Plaintiffs and all other

similarly situated relating to fraudulent binary options schemes involving an intermediary

payee called Grey Mountain Management a/k/a Greymountain Management.

**PARTIES**

2.  Plaintiff JOHN ANDERJASKA is an individual with an address at 36 Napa

Valley Rd, Gaithersburg, MD.

Page **1** of **28**

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 5 of 36

3.  Plaintiff CHUNGYAO CHEN is an individual with an address at 24150 Dawson Ct, Hayward, CA.

4.  Plaintiff TEENA COLEBROOK is an individual with an address at 3940 Broad St, #7258, San Luis Obispo, CA.

5.  Plaintiff JOEL GRIFFITH is an individual with an address at 28587 Cherokee Rose Dr., Highland, CA.

6.  Plaintiff ART HEINEMANN is an individual with an address at 29 Alvarado Rd, Tonasket, WA.

7.  Plaintiff CALVIN WILLIAMS is an individual with an address at 5522 Washington Rd., Kenosha, WI.

8.  Plaintiff CHARLES WITTE is an individual with an address at 8209 Grape Arbor Ct NE, Albuquerque, NM.

9.  Defendant BANK OF AMERICA, N.A. is a national banking association organized under the laws of the United States, with an address at 100 North Tryon Street, Charlotte, NC 28202.

10. Defendant CAPITAL ONE, N.A. is a national banking association organized under the laws of the United States, with an address at 1680 Capital One Drive, McLean, VA, 22102.

11. Defendant CITIBANK, N.A. is a national banking association organized under the laws of the United States, with an address at 399 Park Avenue, New York, NY 10022.

12. Defendant J.P. MORGAN CHASE, N.A. is a national banking association organized under the laws of the United States, with an address at 270 Park Avenue, New York, NY 10017.

13. WELLS FARGO BANK, N.A. is a national banking association organized under the laws of the United States, with an address at 420 Montgomery Street, San Francisco, CA 94104.

## **BINARY OPTIONS FRAUD**

14. Binary options differ from more conventional options in significant ways.

15. A binary option is a type of options contract in which the payout will depend entirely on the outcome of a yes/no proposition.

16. The yes/no proposition typically relates to whether the price of a particular asset that underlies the binary option will rise above or fall below a specified amount.

17. For example, the yes/no proposition connected to the binary option might be something as straightforward as whether the stock price of XYZ company will be above $9.36 per share at 2:30 pm on a particular day, or whether the price of silver will be above $33.40 per ounce at 11:17 am on a particular day.

18. Once the option holder acquires a binary option, there is no further decision for the holder to make as to whether or not to exercise the binary option because binary options exercise automatically.

19. Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset.

20. When the binary option expires, the option holder will receive either a pre-determined amount of cash or nothing at all.

21. Given the all-or-nothing payout structure, binary options are sometimes referred to as "all-or-nothing options" or "fixed-return options."

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 7 of 36

22. Some binary options are listed on registered exchanges or traded on a designated contract market that are subject to oversight by United States regulators such as the CFTC or SEC, respectively, but this is only a small portion of the binary options market.

23. Much of the binary options market operates through Internet-based trading platforms that are usually not in compliance with applicable U.S. regulatory requirements.

24. The number of Internet-based trading platforms that offer the opportunity to purchase and trade binary options has surged in recent years.

25. The increase in the number of these platforms has resulted in an increase in the number of complaints about fraudulent promotion schemes involving binary options trading platforms.

26. Typically, a binary options Internet-based trading platform will ask a customer to deposit a sum of money to buy a binary option call or put contract.

27. For example, a customer may be asked to pay $50 for a binary option contract that promises a 50% return if the stock price of XYZ Company is above $5 per share when the option expires.

28. If the outcome of the yes/no proposition (in this case, that the share price of XYZ Company will be above $5 per share at the specified time) is satisfied and the customer is entitled to receive the promised return, the binary option is said to expire "in the money."

29. If, however, the outcome of the yes/no proposition is not satisfied, the binary option is said to expire "out of the money," and the customer may lose the entire deposited sum.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 8 of 36

30. There are variations of binary option contracts in which a binary option that expires out of the money may entitle the customer to receive a refund of some small portion of the deposit—for example, 5%—but that is not typically the case.

31. In fact, some binary options Internet-based trading platforms may overstate the average return on investment by advertising a higher average return on investment than a customer should expect given the payout structure.

32. For instance, in the example above, assuming a 50/50 chance of winning, the payout structure has been designed in such a way that the expected return on investment is actually negative, resulting in a net loss to the customer.

33. This is because the consequence if the option expires out of the money (approximately a 100% loss) significantly outweighs the payout if the option expires in the money (approximately a 50% gain).

34. In other words, in the example above, an investor could expect, on average, to lose money.

35. In recent years the CFTC and SEC have received numerous complaints of fraud associated with websites that offer an opportunity to buy or trade binary options through Internet-based trading platforms.

36. In essentially all cases, the fraudulent binary options company owns a website that looks like a legitimate binary options broker, using trading signals software.

37. The complaints fall into at least three categories: refusal to credit customer accounts or reimburse funds to customers; identity theft; and manipulation of software to generate losing trades.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 9 of 36

38. The first category of fraud, involves the refusal of certain Internet-based binary options trading platforms to credit customer accounts or reimburse funds after accepting customer money.

39. These complaints typically involve customers who have deposited money into their binary options trading account and who are then encouraged by "brokers" over the telephone or email to deposit additional funds into the customer account.

40. These "brokers" would fraudulently misrepresent their investment experience, and would make fraudulent promises and guarantees regarding the profit that the customer would make, often stating that due to the nature of their trading systems, binary options are "risk-free".

41. Many fraudulent binary options websites would also falsely tout that their trading systems would automatically place profitable trades for the user or provide "signals" for the user to make profitable trades.

42. They would also contain false testimonials or show fake videos of people who had made or were currently making huge profits trading binary options using the fraudulent website's system.

43. Often, the initial investment would be fraudulently made to appear to be successful, encouraging the deposit of more money.

44. The customers' accounts typically would show rapidly accumulating "bonuses" (money "given" to clients by the firms) and "earnings," fraudulently portraying profits that were never actually there, to encourage them to deposit more and to trade more.

45. The "bonuses" would have a more devious purpose, however, because the website's fine print provides that if a customer accepted the "bonus," they would not be

able to withdraw any money from their account until their account has been traded in some enormously high cumulative amount.

46. In other words, the alleged "bonuses" that had been "given" to clients by the firms, would contain many small-print strings attached that would then be used as a pretext to prevent them from ever being able to withdraw their funds.

47. At other times, after what appeared to be an initially successful strategy, the account would then starts to "lose money," and the broker would call to ask the customer to provide more money for a rescue plan.

48. In fact, however, the customers' money had been misappropriated by the company and was never really in the account to begin with.

49. Sometimes, should the customer ask to have their winnings paid out, they would be made aware of a really "hot" trade that was sure to double their money.

50. Invariably, this trade would then lose all of the client's money, and the client would then be asked for more money to "rescue" their account.

51. Other times, or if the above gambit didn't work, when customers would attempt to withdraw their original deposit or the return they have been promised, the trading platforms would refuse or cancel customers' withdrawal requests, refuse to credit their accounts, or would ignore their telephone calls and emails.

52. Other times, the customers would be informed that in fact their accounts now had pending losses due to unsettled trades, and they needed to deposit more money to recover their losses so that they could withdraw the requested money.

53. There are a number of strategies used by these fraudulent companies, however the end result is always the same – all (or nearly all, in the event that the broker allowed the

customer to withdraw some money at the start to perpetuate the illusion of a legitimate venture to encourage more deposits) of the customer's money disappears.

54. The second category of alleged fraud involves identity theft.

55. The third category of alleged fraud, which at times was tied to the first category, involves the manipulation of the binary options trading software to generate losing trades.

56. These complaints allege that the Internet-based binary options trading platforms manipulate the trading software to distort binary options prices and payouts.

57. For example, when a customer's trade is "winning," the countdown to expiration is extended arbitrarily until the trade becomes a loss.

58. Regardless of which category of fraud is perpetrated upon the customer, when the customer thereafter attempts to locate the binary options company, the result is that the contact information listed on the website is all fake.

59. Similarly, although claiming otherwise, these fraudulent binary options companies would never be registered with any regulatory bodies as they claimed to be, and would usually not even registered to do business in the countries or locations in which they claimed to be registered.

60. For example, while many of these companies claimed to be located in England, Scotland, France, or other western European counties, they were in fact located in Israel, Cyprus or Bulgaria.

61. In addition to this ongoing fraudulent activity, many binary options trading platforms operated in violation of other applicable laws and regulations, including registration and regulatory requirements of the CFTC and SEC.

62. Because these firms were not registered with the SEC, CFTC, FINRA, or the NFA, they were not lot allowed to solicit U.S. citizens.

63. Many of the fraudulent binary options companies operated out of Israel, and due to the fraudulent practices rampant throughout the industry, the Israeli Knesset outlawed the binary options industry in October 2017.

64. According to the Times of Israel, prior to the ban, the Israeli binary options industry had been estimated to bring in between $5 billion and $10 billion a year, to number well over 100 companies, and to employ between 5,000 and many tens of thousands of employees.

65. Other companies have operated out of other international countries as well, usually with little oversight into their fraudulent practices.

66. The fraud had gotten so bad that in 2017, the French securities regulator, the Autorité des Marchés Financiers (AMF) stated that close to 100 percent of binary options customers lose some or all of their money.

67. As a result of the rampant fraud, in recent years, there has been an international attempt on cracking down on the fraudulent binary options industry.

68. As a result of all of the fraudulent activity related to the binary options industry, in recent years the SEC, CFTC, FINRA, FBI, and others have all issued warnings related to this fraudulent industry.

69. As reported by the FBI, in 2011, the FBI's Internet Crime Complaint Center (IC3) received four complaints—with reported losses of just more than $20,000—from binary options fraud victims.

70. Fast forward five years, and the IC3 received hundreds of complaints with millions of dollars in reported losses during 2016.

71. As reported by the FBI, some European countries have reported that binary options fraud complaints now constitute 25 percent of all the fraud complaints received.

72. As further reported by the FBI, fraudulent binary options website operators have gone to great lengths to recruit investors.

73. They advertise their platforms—often on social networking sites, various trading websites, message boards, and spam e-mail—with big promises of easy money, low risk, and superior customer service.

74. Potential investors are also cold-called from boiler room operations, where high-pressure salespeople use banks of phones to make as many calls as possible to offer "once-in-a-lifetime" opportunities.

75. The SEC and CTFC have begun bringing more and more actions against fraudulent binary options companies.

76. For example, in 2016, one fraudulent binary options company, Banc de Binary, and its founder Oren Shabat Laurent, were subject to an $11 million fine from the SEC and CFTC for illegally soliciting U.S. customers despite having been in receipt of a cease and desist order prior to the charges issued against the firm in 2013.

77. In 2016, the SEC entered a cease and desist and disgorgement order against EZTD INC., based out of Israel and Cyprus, for operating fraudulent binary options websites between 2011 and 2014.

78. In July 2016, the CFTC obtained a judgment from the Northern District of Illinois ordering two Israel-based binary options websites, Vault Options, Ltd. and Global Trader

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 14 of 36

365, to jointly and severally pay a $3 million civil monetary penalty and $1,587,731 in restitution to their defrauded customers.

79. In 2016, the CFTC filed suit against commodity trading advisors, including Vision Financial Partners, for violation of Commodity Exchange Act by fraudulent scheme involving over one hundred investors in binary options traded through foreign trading platforms located in Israel, Cyprus, and United Kingdom in the amount of millions of dollars.

80. In March 2017, Vision Financial Partners and its principal, Neil Pecker, were ordered to pay more than $6.5 million dollars in restitution for their binary options fraud.

81. In May 2018, a US grand jury indicted Lee Elbaz, the former CEO of Israeli binary options company Yukom Communications, for binary options fraud carried out through the websites BigOption and BinaryBook, after she was arrested by the FBI in 2017.

82. In June 2018, the FBI arrested Jared J. Davis, and charged him with operating fraudulent binary options websites OptionMint, OptionKing and OptionQueen, which used the SpotOption platform, which operated from Israel.

83. In September 2018, the SEC and CFTC filed actions against eleven individuals and five entities in a nationwide binary options fraud ring involving at least one hundred thousand accounts and $25 million dollars in deposits between 2014 and 2016.

84. In December 2018, the SEC filed an action against an Ohio resident and his Pennsylvania business partner in connection with an unregistered and fraudulent binary options business, that had garnered at least $10 million dollars from 2012 through 2016.

85. Also in December 2018, the SEC charged a New York individual with engaging in an online binary options scheme that defrauded retail investors out of approximately $4 million.

86. In 2017, the CFTC announced a civil complaint against Israeli-American binary options operator Jason B. Scharf and his affiliate, Michael Shah, alleging that they swindled more than $18 million from at least 8,000 victims, most of them located in the United States.

87. As described in the CFTC complaint, Scharf's binary options trading websites, citrades.com and AutoTradingBinary.com, fraudulently solicited customers to open binary options accounts with false claims of outsized profits and "guaranteed returns" trading binary options, bolstered by fake testimonials of purportedly successful customers, starting from at least January 2014.

88. The complaint further alleged that once customers deposited money with CITrades, they did not get it back; instead it was routed through numerous offshore companies and bank accounts and ultimately found its way back to Scharf and the other beneficiaries of the fraudulent scheme.

89. The complaint further alleged that Shah's company, Zilmil, developed and sold autotrading binary options systems that don't actually work - instead of placing winning trades as promised, Zilmil's trading systems were designed to place trades that result in customer losses, sometimes depleting the customer's entire account in just a few hours.

90. CITrades was not their only binary options client; almost all of the binary options websites that Shah promoted were based in Israel. These included LBinary, Global Trader 365, Vault Options, TraderXP, Trade Rush, Banc de Binary, CITrades,

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 16 of 36

OptionRally, RBOptions, Bloombex Options, Redwood Options, BeeOptions, Amber

Options, OptionsXO, and SpotFN.

91. In March 2018, the Florida Middle District Court entered an order directing a

permanent injunction and disgorgement against Scharf and A&J Media Partners, Inc.

92. CITrades and many of the other Shah-promoted fraudulent binary options

companies used a firm called Grey Mountain Management as one of their main payment

processors.

93. As described immediately below, dozens of fraudulent binary options companies

used Grey Mountain Management to process their payments.

## GREY MOUNTAIN MANAGEMENT a/k/a GREYMOUNTAIN MANAGEMENT, LTD ("GMM")

94. GMM was a company based out of Ireland that provided credit card processing

for many fraudulent binary options platforms.

95. Upon information and belief, GMM was set up in 2015 to be used as a payment

services provider for fraudulent online binary options websites.

96. GMM was used by dozens of fraudulent binary options firms to process payments

made by binary options customers in the United States and elsewhere.

97. Upon information and belief, GMM was set up mainly to process payments from

U.S.-based binary options customers.

98. Upon information and belief, GMM also supplied technology, sales and market

information to these binary options firms to help them defraud their customers.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 17 of 36

99. Upon information and belief, the following binary options platforms, among numerous others, used GMM for their payments:

a) Porter Finance
b) Bloombex-Options
c) Cherry Trade
d) Glenridge Capital
e) BeeOptions
f) Vision Binary
g) UKOptions
h) Starling Capital
i) MRT Market
j) GTOptions
k) FX Cortex
l) Morton Finance
m) Scheenber
n) Binary Profit System
o) Iq Option
p) Professional Binary Robot
q) Edgedale Finance a/k/a Innovate Markets
r) Omega Options
s) Tropical Trade
t) Rumelia Capital
u) Barlkey Capital
v) BinaryBanc
w) BSD Options
x) Option King a/k/a Advanced Option Capital
y) CITrades

100.    GMM claimed to provide "white label" services for dozens of binary options websites.

101.    Additionally, those binary options websites that used GMM as a "White Label Solution" also used "Worldwide Tech" as their "payment processor."

102.    The only employee of Worldwide Tech was a "Director" by the name of "Uri Katz," who was also a "Director" of Banc de Binary, which as stated above was the subject of an SEC cease and desist order in 2013 and $11 million dollar fine from the CFTC in 2016.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 18 of 36

103.     Upon information and belief GMM also used a shell company called Nelstone Services Limited ("Nelstone"), which would frequently appear on customers' credit cards.

104.     Many payments also appeared to be originating from a website called SithTrader.com, which was registered and operated by Nelstone.

105.     All of the binary options platforms involved with GMM and/or Worldwide Tech and/or Nelstone illegally operated and solicited U.S. residents to trade binary options without being registered with the SEC or the CFTC.

106.     These binary options platforms were all fraudulent.

107.     These binary options platforms would engage in the fraudulent activity described above in order to induce customers to deposit initial money, and then further money into their accounts.

108.     Upon information and belief, these platforms had call centers, who would purchase lead lists and then bombard leads with calls in order to persuade them to "trade" binary options.

109.     They would also use spam email, message-board posts, fake advertisements, fake testimonials, fake promises and guarantees, all to fraudulently induce customers to deposit money that would then be stolen by the companies.

110.     On their websites and in their communications with customers, GMM-related firms misrepresented the expertise and experience of their "brokers" and portrayed phony locations for their operations.

111.     These "brokers" would reach out to the customers with fraudulent guarantees of returns or profits.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 19 of 36

112.    The "brokers" would also give customers "bonuses," thereby ensuring that the customer would never be able to withdraw any of the money in their accounts.

113.    These platforms would dupe victims worldwide into believing that they were successfully investing and earning money, encouraging them to deposit more and more into their accounts, until the company eventually cut off contact with the investors and disappeared with all or almost all of their money.

114.    Often times, no trading whatsoever had actually taken place in the customer's accounts, and the firms would simply have fraudulent accounts showing the customers making significant profit in their accounts.

115.    For those firms that had actual trades, if the client was making more money than the company, then the trading algorithm would be rigged, and/or the client would not be allowed to withdraw their money, until all of the money would be lost from the customer's account into the firm's account.

116.    Customers would also be fraudulently told that they could withdraw their money whenever they wanted.

117.    When a customer would actually try to withdraw any money, however, the customer would either be ignored, told that they couldn't, or told that in order to do so they would have to deposit more money.

118.    The actions of GMM and some of its affiliated entities did not go unnoticed.

119.    In 2016, the Saskatchewan Securities Division issued a cease and desist against Edgedale Finance and GMM for engaging in fraudulent and unregistered binary options activity.

120.     In September 2016, the Ontario Securities Commission added GMM to their warning list as an unregistered securities entity.

121.     In 2017, the Wisconsin Division of Securities issued a summary cease and desist order against GMM for aiding and abetting a fraudulent binary options operation without being registered with the SEC, CFTC, NFA, FINRA, or the Cyprus Securities and Exchange Commission.'

122.     Similarly, in 2018, the Missouri Securities Division submitted a petition for a cease and desist against GMM, stemming from two Missouri residents who from April 2015 through October 2016, invested a total of approximately $170,000.00 in unregistered, non-exempt securities through Glenridge Capital, a purported binary option company owned or managed by GMM and operating out of the Republic of Ireland.

123.     Although their accounts purportedly grew to $300,000 and $794,000, one of the individuals was not able to withdraw any money, while the second had received only $17,500 in returns.

124.     As of June 7, 2018, Glenridge Capital's website was no longer available and its phone number does not work, and the customers have thus lost almost all of their money due to this fraud.

125.     Like the thousands of others who have been defrauded through fraudulent binary options companies like Glenridge Capital, these customers will likely never receive any of their money back.

126.     After the Times of Israel began an expose on the fraudulent binary options industry operating out of Israel, in 2016, the Irish Central Bank's money laundering unit

wrote to GMM, saying it had concerns about GMM's involvement in electronic trading
and fund movements.

127.     Thereafter, in 2017 GMM filed for a petition to be wound up, and it is
currently in liquidation.

128.     However, nearly all of the money that had been processed through GMM
had already been funneled to the beneficiaries of the fraudulent binary options
companies.

129.     Last year, a group of defrauded investors filed an action against GMM in
the United Kingdom seeking 4.1 million Euro in losses relating to binary options scams.

## FACTS PERTAINING TO CLASS REPRESENTATIVE PLAINTIFFS

130.     As described below, all of the class representative Plaintiffs were
defrauded by GMM-affiliated entities.

131.     Plaintiff JOHN ANDERJASKA is a 63-year-old who opened up an
account with GMM-affiliated Glenridge Capital in or about March 2016.

132.     From in or about March 2016 through in or about April 2017, JOHN made
approximately $207,000 in deposits using his Capital One debit and credit cards.

133.     By April 2017, JOHN's Glenridge Capital account reflected a balance of
$1.15 million dollars.

134.     However, when JOHN attempted to withdraw his money from his account,
Glenridge Capital refused and then cut off contact with him.

135.     Plaintiff CHUNGYAO CHEN is a 54-year-old who opened up an account
with GMM-affiliated Glenridge Capital in or about November 2015.

136.     From in or about November 2015 through in or about July 2016,
CHUNGYAO made approximately $83,000 in deposits using his Chase and Bank of
America credit cards.

137.     Although his Glenridge Capital accounts showed significant profits, when
CHUNGYAO attempted to withdraw money from his account, Glenridge Capital refused
and then cut off contact with him.

138.     Plaintiff TEENA COLEBROOK is a 62-year-old who opened up an
account with GMM-affiliated Glenridge Capital in or about December 2015.

139.     From in or about December 2015 through July 2016, TEENA made
approximately $168,650 in deposits through Wells Fargo wire transfers, credit card, and
debit card payments.

140.     As of April 2017, her Glenridge account showed a balance of more than
$532,000; however, when TEENA attempted to withdraw her money in April 2017,
Glenridge Capital refused and then cut of contact with her.

141.     When TEENA thereafter attempted to perform a chargeback for fraud,
Wells Fargo refused, saying that she had authorized the payments.

142.     Plaintiff JOEL GRIFFITH is a 69-year-old who opened an account with
GMM-affiliated Glenridge Capital in or about October 2015.

143.     From in or about October 2015 through September 2016, JOEL made
approximately $144,630 in deposits through Bank of America via debit card payments.

144.     When JOEL thereafter attempted to withdraw his money, Glenridge
Capital refused and then cut of contact with him.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 23 of 36

145.     In April 2017 JOEL attempted a chargeback with Bank of America, his request was refused.

146.     Plaintiff ART HEINEMAN is a 75-year-old who opened up an account with GMM-affiliated Vision Finance in or about November 2015.

147.     From in or about November 2015 through January 2016 ART made deposits of approximately $37,500 through his Wells Fargo debit and credit cards.

148.     In or about January 2016, ART complained to Wells Fargo regarding what he believed was fraudulent activity by Vision Finance.

149.     Wells Fargo told ART to give Vision Finance time to resolve the issue.

150.     In or about January 2016, ART initiated a chargeback with Wells Fargo.

151.     In or about March 2016, Wells Fargo denied the chargeback.

152.     In or about March 2016, ART sent proof of the fraud to Wells Fargo.

153.     In or about July 2016, Wells Fargo again denied the chargeback, saying that they were unable to override a customer-merchant agreement.

154.     Although his account showed a balance of more than $54,000, ART has been unable to retrieve his funds from Vision Finance.

155.     Plaintiff CALVIN WILLIAMS is a 62-year-old who opened an account with GMM-affiliated Glenridge Capital in or about late 2015.

156.     From in or about late 2015 to in or about late 2016, CALVIN deposited approximately $283,000 into his account using his Capital One, Chase, and Bank of America wires, debit cards, and credit cards.

157.     Although his Glenridge Capital accounts showed significant profits, when Calvin thereafter attempted to withdraw his money, Glenridge Capital refused and then cut of contact with him.

158.     When CALVIN complained to Capital One, Chase, and Bank of America, that he had been defrauded, they all denied his requests for help.

159.     Plaintiff CHARLES WITTE is a 70-year-old who opened an account with GMM-affiliated Glenridge Capital in or about January 2016.

160.     From in or about February 2016 through in or about November 2016, CHARLES made approximately $69,000 in deposits using his Wells Fargo and Bank of America credit cards.

161.     As of January 2017, his Glenridge account showed a balance of more than $93,000; however, when CHARLES attempted to withdraw his money, Glenridge Capital refused and then cut of contact with him.

162.     When CHARLES attempted to perform a chargeback for fraud in July 2017, Bank of America and Wells Fargo refused, saying that he had authorized the payments.

## CLASS ACTION ALLEGATIONS

163.     Plaintiffs bring this class action pursuant to Article 9 of the New York Civil Practice Law and Rules.

164.     Certification of a class of individuals whose payments were sent to GMM, Worldwide Tech, Nelstone, or any entity associated with GMM is appropriate because: a) common questions of law and fact exist as to all members of the class, and predominate over the questions affecting only individual members; b) upon information and belief

there are tens of thousands of defrauded investors and joinder of each individual is impractical, and those persons' names and addresses are identifiable through documents or other information maintained by Defendants; c) Plaintiffs' claims are typical of the claims of each class member, and Plaintiffs will therefore be adequate and appropriate class representatives; d) Plaintiffs are adequate representatives of the class because their interests are aligned with, and are not antagonistic to, the interests of the members of the class they seek to represent, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the class; and e) a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive.  It would be virtually impossible for the members of the class to individually redress effectively the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a unified proceeding.

### AS AND FOR A FIRST CAUSE OF ACTION: NEGLIGENCE

165.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "164" inclusive, as if more fully set forth herein at length.

166.    As early as 2015, Defendants were on notice that payments and charges involving GMM and its associated entities were likely part of a scheme to defraud and misappropriate.

167.    Defendants had notice and/or knowledge that its customers' funds were being diverted and misappropriated through multiple customer complaints and chargeback attempts, all with the same basic facts of customers depositing money with these GMM-affiliated entities and then not being able to withdraw their money.

168.    Defendants, however, did nothing in the light of this clear evidence of fraud, and continued to allow customers to make payments and transfers to GMM and its affiliated entities.

169.    Defendants benefited from such payments and transfers in the form of fees (such as wire fees) and interest charges (such as where credit cards were involved).

170.    Defendants also benefited by charging customers additional fees for chargeback reversals after initially crediting customer accounts for a chargeback and then reversing their decision.

171.    The circumstances related to these payments and transfers to GMM and its affiliated entities reasonably supported the inference that fraud and misappropriation was taking place.

172.    Defendants knew that hundreds of thousands of transactions were being made to GMM and these affiliated overseas companies, none of which were registered with any regulatory body in the United States.

Page **23** of **28**

173.     Due to customer complaints and attempted chargebacks, Defendants were also made aware that GMM and its affiliated entities were involved in a fraudulent scheme to defraud U.S. citizens and the Defendants' customers.

174.     Having such knowledge, Defendants were under a duty to make reasonable inquiry and endeavor to prevent the fraud and/or misappropriation.

175.     Upon information and belief, starting in at least 2015, Defendants received hundreds if not thousands of communications from customers seeking fraud-related chargebacks or otherwise complaining about fraud in connection with GMM and its associated entities.

176.     A prudent inquiry would have immediately uncovered that GMM and its associated entities were unregistered foreign entities soliciting payments from U.S. citizens as part of a binary options fraud.

177.     Instead, so as to be able to avoid having to chargeback the customers' funds, and/or so that it could continue making its fees and interest, Defendants turned a blind eye and informed customers that they would have to work it out with GMM and/or the GMM-associated entities.

178.     Upon information and belief, Defendants did in fact process chargebacks for certain customers, due to proven allegations of fraud, yet continued to allow other customers to make payments to GMM and its associated entities.

179.     Had Defendants acted immediately, they could have recovered customers' funds through chargebacks and prevented the future fraud and misappropriation relating to their customers' funds.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 28 of 36

180.     Accordingly, Defendants' breach of its duty proximately caused Plaintiffs' injuries in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION: AIDING AND ABETTING

181.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "180" inclusive, as if more fully set forth herein at length.

182.     GMM and its associated entities were operating a fraudulent scheme to misappropriate Plaintiffs' money.

183.     Defendants knew about the fraud, as upon information and belief there had been numerous chargebacks attempted by customers and complaints made to Defendants regarding GMM-related fraud.

184.     Defendants provided substantial assistance to these fraudulent entities by continuing to transfer money and processing payments to them.

185.     Defendants ignored the clear evidence that its customers' funds were being misappropriated.

186.     Defendants had sufficient information to place them under a duty to make reasonable inquiry and endeavor to prevent the misappropriation of Plaintiffs' funds.

187.     Defendants ignored this duty and instead continued to assist GMM and the GMM-related entities in defrauding Plaintiffs.

188.     Defendants were not allowed to close their eyes and ignore the clear implications of what was taking place.

189.     By their actions and omissions, Defendants thereby aided and abetted GMM and the GMM-related entities in their schemes.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 29 of 36

190.     Defendants' aiding and abetting proximately harmed Plaintiffs' in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION: FRAUDULENT CONCEALMENT

191.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "190" inclusive, as if more fully set forth herein at length.

192.     As a result of the numerous transactions that the Defendants did or should have flagged as fraudulent, the Defendants possessed superior knowledge, not readily available to Plaintiffs regarding the fraud that GMM and its affiliated entities were perpetrating.

193.     The Defendants knew that their customers were acting on the basis of mistaken knowledge regarding the legitimacy of the GMM-related entities, but processed their payments and wire transfers anyway.

194.     Having a duty to make reasonable inquiry and endeavor to prevent the fraud and/or misappropriation that Defendants knew was taking place, Defendants had a duty to inform Plaintiffs of the fraudulent scheme that was transpiring.

195.     Defendants, however, concealed this information from Plaintiffs, and continued to process payments and wires.

196.     Defendants benefited from this concealment, in the form of additional fees and interest.

197.     Defendants thereby fraudulently concealed this information from Plaintiffs and became parties to the GMM-entities' fraudulent schemes.

Case 1:19-cv-03057-LTS-GWG   Document 1-1   Filed 04/05/19   Page 30 of 36

198.    Defendants' fraudulent concealment proximately harmed Plaintiffs' in an

amount to be determined at trial.


**WHEREFORE**, Plaintiffs seek relief against Defendants as follows:

a.  An order certifying the case as a class action on behalf of the proposed class

under Article 9 of the CPLR and appointing Plaintiffs and the undersigned

counsel of record to represent same;

b.  An award of compensatory damages in an amount to be determined;

c.  An award of punitive damages;

d.  An award of pre-judgment and post-judgment interest as provided by law;

e.  An award of attorneys' fees and costs; and

f.  Such other relief as the Court deems just and proper.


Dated:  Fresh Meadows, New York
        February 9, 2019


                                            /Jonathan E. Neuman/
                                    JONATHAN E. NEUMAN, ESQ.
                                    *Attorney for Plaintiffs*
                                    176-25 Union Turnpike, Suite 230
                                    Fresh Meadows, New York 11366
                                    (347) 450-6710
                                    (718) 228-3689 *facsimile*
                                    jnesq@jenesqlaw.com

## VERIFICATION BY ATTORNEY

STATE OF NEW YORK       )
                                   ) ss.:
COUNTY OF QUEENS        )

      JONATHAN E. NEUMAN, an attorney duly admitted to practice law in the State of New York, under penalties of perjury, affirms the following:

      That affirmant is the attorney for the Plaintiff in the action within; that affirmant has read the foregoing COMPLAINT and knows the contents thereof; that the same is true to the affirmant's own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters believes it to be true.  The reason this verification is not made by Plaintiff and is made by affirmant is that Plaintiffs are not presently located in the county where the affirmant-attorney maintains his office.  Affirmant further says that the grounds of his belief as to all matters in the COMPLAINT are based upon conversations with the Plaintiffs and a review of documents relevant to this action.

Dated: Fresh Meadows, NY
       February 9, 2019

                                         /Jonathan E. Neuman/
                                 JONATHAN E. NEUMAN, ESQ.

## ATTORNEY CERTIFICATION

      I, JONATHAN E. NEUMAN, ESQ., an attorney, hereby certify that to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the presentation of the within papers or the contentions therein are not frivolous within the meaning of 22 NYCRR § 130.1.1(c).

Dated: Fresh Meadows, NY
       February 9, 2019

                                         /Jonathan E. Neuman/
                                 JONATHAN E. NEUMAN, ESQ.

Page **28** of **28**

Case 1:19-cv-03057-LTS-GWG Document 1-1 Filed 04/05/19 Page 32 of 36

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

John Anderjaska et al
Plaintiff(s),

vs.

Bank of America, N.A., et al
Defendant(s).

ATTORNEY: LAW OFFICES OF JONATHAN E NEUMAN,
ESQ.

INDEX NUMBER: 151484/2019

DATE OF FILING: 02/11/2019

## AFFIDAVIT OF SERVICE

STATE OF North Carolina: COUNTY OF MECKLENBURG    ss:

I, Wendy L. Henrich, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of North Carolina.

That on **03/12/2019** at **2:18 PM** at **100 North Tryon Street, Charlotte, NC 28255**,
Deponent served the **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** upon Bank of America, N.A., defendant/respondent/recipient herein.

Said service was effected in the following manner;

By delivery to and leaving a true copy to **Sheridan Cockrel** personally, a person who stated to be an authorized agent to receive process service for **Bank of America, N.A.**. Deponent knew said bank so served to be the bank described in said **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** as said defendant/respondent/recipient. Deponent knew the individual accepting service to be an/the **Banking Officer** thereof.

Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows: Sex: **Female** Skin: **Black** Hair: **Black** Age (Approx): **42** Height(Approx): **5'2"** Weight(Approx): **100-110 lbs** Glasses: **No** Other:

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Wendy L. Henrich

Sworn to before me this
March *13* 2019

*Ruth Reynolds*

RUTH REYNOLDS
NOTARY PUBLIC
Mecklenburg County
North Carolina
My Commission Expires March 31, 2021

Executive Attorney Service, Inc. 585 Stewart Ave, Ste LL16, Garden City, NY 11530 516-333-3447 Lic# 1422060
Case No: 1580341

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

John Anderjaska et al
Plaintiff(s),

vs.

Bank of America, N.A., et al
Defendant(s).

ATTORNEY: LAW OFFICES OF JONATHAN E NEUMAN,
ESQ.

INDEX NUMBER: 151484/2019

DATE OF FILING: 02/11/2019

## AFFIDAVIT OF SERVICE

STATE OF Washington DC: COUNTY OF District of Columbia    ss:

I, Abel Emiru, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of Washington DC.

That on **03/07/2019** at **3:12 PM** at **1680 Capital One Drive, McLean, VA 22102,**
Deponent served the **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** upon **Capital One, N.A.,** defendant/respondent/recipient herein.

Said service was effected in the following manner;

By delivery to and leaving a true copy to **Scarlett Saunders** personally, a person who stated to be an authorized agent to receive process service for **Capital One, N.A..** Deponent knew said bank so served to be the bank described in said **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** as said defendant/respondent/recipient. Deponent knew the individual accepting service to be an/the **Administrative Assistant** thereof.

Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows: Sex: **Female**  Skin: **White**  Hair: **Blonde**  Age (Approx): **63** Height(Approx): **5'10''**  Weight(Approx): **120-130 lbs**  Glasses: **No** Other:

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Sworn to before me this 11th day of
March 2019

_Angela H. Croson_
Angela H. Crosen
Notary Public, District of Columbia
My Commission Expires March 31, 2019

_____
Abel Emiru

Executive Attorney Service, Inc. 585 Stewart Ave, Ste LL16, Garden City, NY 11530 516-333-3447 Lic# 1422060
Case No: 1580342

Case 1:19-cv-03057-LTS-GWG Document 1-1 Filed 04/05/19 Page 34 of 36

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

John Anderjaska et al
Plaintiff(s),

vs.

Bank of America, N.A., et al
Defendant(s).

ATTORNEY: LAW OFFICES OF JONATHAN E NEUMAN, ESQ.

INDEX NUMBER: 151484/2019

DATE OF FILING: 02/11/2019

**AFFIDAVIT OF SERVICE**

STATE OF New York: COUNTY OF Nassau    ss:

I, Alexander James, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York.

That on **3/6/2019** at **9:25 AM** at **CT Corporation, 28 Liberty Street, New York, NY 10004**,
Deponent served the **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** upon **J.P. Morgan Chase Bank, N.A.** , defendant/respondent/recipient herein.

Said service was effected in the following manner;

By delivery to and leaving a true copy to **Nora Dindyal** personally, a person who stated to be an authorized agent to receive process service for **J.P. Morgan Chase Bank, N.A.** . Deponent knew said bank so served to be the bank described in said **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** as said defendant/respondent/recipient. Deponent knew the individual accepting service to be an/the **Intake Specialist** thereof.

Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows: Sex: **Female** Skin: **Brown/Indian** Hair: **Black** Age (Approx): **55** Height(Approx): **5'3"** Weight(Approx): **120-130 lbs** Glasses: **No** Other:

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Sworn to before me this

March_____2019

--------------------------------------------------------------------
CRAIG L. EISENBERG
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01EI6030725
QUALIFIED IN SUFFOLK
COMMISSION EXPIRES SEPTEMBER 20, 2021

Alexander James
License No. 1438821

Executive Attorney Service, Inc. 585 Stewart Ave, Ste LL16, Garden City, NY 11530 516-333-3447 Lic# 1422060
Case No: 1580344

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

John Anderjaska et al
Plaintiff(s),

ATTORNEY: LAW OFFICES OF JONATHAN E NEUMAN, ESQ.

vs.

INDEX NUMBER: 151484/2019

Bank of America, N.A., et al
Defendant(s).

DATE OF FILING: 02/11/2019

## AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau      ss:

I, Alexander James, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York.

That on **3/6/2019** at **9:25 AM** at **CT Corporation, 28 Liberty Street, New York, NY 10004**,
Deponent served the **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** upon **Citibank N.A.**, defendant/respondent/recipient herein.

Said service was effected in the following manner;

By delivery to and leaving a true copy to **Nora Dindyal** personally, a person who stated to be an authorized agent to receive process service for **Citibank N.A.**. Deponent knew said bank so served to be the bank described in said **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** as said defendant/respondent/recipient. Deponent knew the individual accepting service to be an/the **Intake Specialist** thereof.

Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows: Sex: **Female**  Skin: **Brown/Indian**  Hair: **Black**  Age (Approx): **55** Height(Approx): **5'3"**  Weight(Approx): **120-130 lbs**  Glasses: **No** Other:

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Sworn to before me this

March_____20___

--------------------------------------------------------------
CRAIG L. EISENBERG
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01E16030725
QUALIFIED IN SUFFOLK
COMMISSION EXPIRES SEPTEMBER 20, 2021

_____
Alexander James
License No. 1438821

Executive Attorney Service, Inc. 585 Stewart Ave, Ste LL16, Garden City, NY 11530 516-333-3447 Lic# 1422060

Case No: 1580343

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

John Anderjaska et al
Plaintiff(s),

vs.

Bank of America, N.A., et al
Defendant(s).

ATTORNEY: LAW OFFICES OF JONATHAN E NEUMAN, ESQ.

INDEX NUMBER: 151484/2019

DATE OF FILING: 02/11/2019

## AFFIDAVIT OF SERVICE

STATE OF New York: COUNTY OF Nassau     ss:

I, Alexander James, being duly sworn deposes and says deponent is not a party to this action and is over the age of eighteen years and resides in the state of New York.

That on **3/6/2019** at **9:25 AM** at CT Corporation, 28 Liberty Street, New York, NY 10004,
Deponent served the **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** upon **Wells Fargo Bank, N.A.,** defendant/respondent/recipient herein.

Said service was effected in the following manner;

By delivery to and leaving a true copy to **Nora Dindyal** personally, a person who stated to be an authorized agent to receive process service for **Wells Fargo Bank, N.A.**. Deponent knew said bank so served to be the bank described in said **Summons and Class Action Complaint bearing Index Number and Date of Filing, Notice of Electronic Filing** as said defendant/respondent/recipient. Deponent knew the individual accepting service to be an/the **Intake Specialist** thereof.

Deponent describes the individual served to the best of deponent's ability at the time and circumstances of service as follows: Sex: **Female**  Skin: **Brown/Indian**  Hair: **Black**  Age (Approx): **55** Height(Approx): **5'3''**  Weight(Approx): **120-130 lbs**  Glasses: **No** Other:

I certify that the foregoing statements made by me are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Sworn to before me this

March_____2019

----------------------------------------
CRAIG L. EISENBERG
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01E16030725
QUALIFIED IN SUFFOLK
COMMISSION EXPIRES SEPTEMBER 20, 2021

Alexander James
License No. 1438821

Executive Attorney Service, Inc. 585 Stewart Ave, Ste LL16, Garden City, NY 11530 516-333-3447 Lic# 1422060
Case No: 1580345